**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SADARI IMARI BROWN,

|  |  |
|---|---|
| | CIVIL ACTION NO. 16-10472 |
| *Plaintiff*, | DISTRICT JUDGE MARK A. GOLDSMITH |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 13, 14)

### I.        RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Brown is not disabled. Accordingly, **IT IS RECOMMENDED** that Brown's Motion for Summary Judgment, (Doc. 13), be **DENIED**, the Commissioner's Motion, (Doc. 14), be **GRANTED**, and that this case be **AFFIRMED**.

### II.        REPORT

#### A.        Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Sadari Imari Brown ("Brown") claim for a period of disability, Supplemental Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*,

1

and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14).

Brown previously filed applications for DIB and SSI on January 27, 2010. (Tr. 16). On August 2, 2011, ALJ Oksana Xenos affirmed the initial denial of her claim and found her not disabled from her alleged onset date of October 2, 2009, through the date of the decision. (Tr. 100-121). Brown did not appeal the decision, and it thus became binding upon all parties.

On April 2, 2013, Brown filed renewed applications for DIB and SSI, alleging a disability onset date of January 1, 2010. (Tr. 238-50). The Commissioner denied both claims. (Tr. 126-49). Brown then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 26, 2014, before ALJ Kim Soo Nagle. (Tr. 34-73). At the hearing, Brown—represented by her attorney, Andrea L. Hamm—testified, alongside Vocational Expert ("VE") Michelle Marie Peters-Pagella. (*Id.*). The ALJ's written decision, issued August 6, 2014, found Brown not disabled. (Tr. 16-29). On December 20, 2015, the Appeals Council denied review, (Tr. 1-5), and Brown filed for judicial review of that final decision on February 9, 2016. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v.*

2

*Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner

is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.      ALJ Findings

Following the five-step sequential analysis, the ALJ found Brown not disabled under the Act. (Tr. 16-29). At Step One, the ALJ found that Brown last met the insured status requirements of the Social Security Act on September 30, 2013, and had not engaged in substantial gainful activity during the period between August 3, 2011, and April 14, 2013, the alleged closed period of disability. (Tr. 20). At Step Two, the ALJ concluded that the following impairments qualified as severe: "major depressive disorder and generalized anxiety disorder" (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 20-23). Thereafter, the ALJ found that through her date last insured, Brown had the residual functional capacity ("RFC") to

5

perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> [U]nskilled, routine, non-production-oriented, self-paced work with occasional contact with the general public, co-workers, and supervisors; cannot climb ladders, ropes, or scaffolds; should avoid concentrated exposure to fumes, odors, dusts, noxious gases, and poor ventilation; and should avoid hazards, such as moving machinery and unprotected heights.

(Tr. 23). At Step Four, the ALJ found that Brown could not have performed any past relevant work during the closed period of disability. (Tr. 27). Proceeding to Step Five, the ALJ determined that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (Tr. 27-29).

### E.      Administrative Record

#### 1.      Medical Evidence

The Court has reviewed Brown's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.      Application Reports and Administrative Hearing

##### i.      Function Report

On March 14, 2013, Brown filled out a Function Report. (Tr. 265-75). In it, she wrote that she lived in a house with family, and noted that "I have had about 5 or 6 mental breakdowns. I have a fear of driving and being around people." (Tr. 268). At the time, she took care of her son, Amir Brown. (Tr. 269). Her mother helped cook, clean, and drive, because Brown's panic attacks now interfered with those tasks. (269-70). Panic attacks also

6

caused difficulty sleeping. (*Id.*). She noted, however, no problems with personal care, (Tr. 269), nor cleaning the house, albeit with some pressure from her mother to help. (Tr. 270).

Two to three times a week, Brown would go out, though not alone because of her "[s]evere anxiety," which made "crowds" a "problem." (Tr. 271). And two to three times a month, Brown's son would take her to get "household items and groceries." (*Id.*). Although Brown noted an ability to pay bills, count change, and handle a savings count, she also indicated "[d]ifficulty writing checks and balancing a checkbook after my illness." (*Id.*). Brown also said she had no hobbies anymore due to panic attacks, anxiety, and depression. (Tr. 272). She did, however, write that she spent time with others: "I try really hard to take care of personal business with support . . . once or twice a week." (*Id.*). Her primary activities included therapy, support groups, and visits to the psychiatrist. (*Id.*). In total, however, she wrote that "I no longer have a social life." (Tr. 273).

Providing information about abilities, Brown marked difficulty with memory, completing tasks, concentration, understanding, and following instructions. Her capacity to pay attention "depend[ed]" on the circumstances, but it was accompanied by "[d]ifficulty." (*Id.*). She noted an inability to handle stress or changes in routine, and an inability to "cope" with unusual behavior or fears. (Tr. 274).

Brown also filed a second Function Report, dated June 26, 2013. (Tr. 313-25). This Function Report differed in certain significant respects from the previous one. Unlike the first report, which noted no problems with personal care, this report noted problems dressing, bathing, caring for her hair, and shaving. (Tr. 319). She indicated also that her son did all the housework, (Tr. 320), and that she did not go shopping "because I can't

decide what to get." (Tr. 321). And though she signified no issues paying bills, counting change, handling a savings account, or using a checkbook, she also wrote "I can't make decisions on money." (Tr. 321-22). She noted that she enjoyed dancing and going to the movies, which she did "every weekend" before the onset of her illness. (Tr. 322). She indicated that she did not spend time with others, nor go anywhere on a regular basis. (*Id.*). She added difficulty with talking and getting along with others to those abilities affected by her conditions.

Brown's case manager, Gabrielle Pitts, filled out a case report as well, on June 26, 2013. (Tr. 326-37). It repeats nearly verbatim the content of Brown's June 26, 2013 Function Report, and is written in the first person.

### ii.        Brown's Testimony at the Administrative Hearing

At the hearing before ALJ Kim Soo Nagle, Brown noted that she was a full time "development associate" at "American Red Cross." Tr. 42). Before that, Brown indicated she had last worked in 2009 as a shoe salesman. (Tr. 43). And before that, she worked as a development officer at a hospital, a media consultant for the "Health Department," and as a fund raiser. (Tr. 43-44). She stopped working when she was laid off, and thereafter she applied for, and received, unemployment benefits for about six or seven months. (Tr. 44-45).

During the alleged period of disability, Brown "wasn't able to do anything except for just lay in the bed and watch TV." (Tr. 45). She indicated that she neither cooked, nor took care of grooming and personal hygiene, nor cared for pets, nor did chores or housework, nor use the Internet, nor socialize, although she did have a boyfriend for four

8

years (with whom she did socialize, about "once or twice a week"). (Tr. 45-46, 65). She had a driver's license, but "I wasn't driving much at all. I would drive myself to the clinic, and I would come home, and that was it." (Tr. 46-47). In February and March of 2013, she did use the Internet to search for jobs, and applied for her current position in that time. (Tr. 47). She also "basically didn't go" to any store, as her mother and son "usually took care of that." (Tr. 48).

Asked about her condition during the closed period, Brown said "I had anxiety to the point I was afraid to go outside. And the depression got me to the point where I was incapable of leaving the house. I wouldn't – I wasn't taking care of myself, my hygiene, my personal hygiene. I wasn't able to communicate effectively with anybody. I just was – basically, I just was like a vegetable. I just stayed in the house and laid in the bed." (*Id.*). Her mother typically took her son to school on her behalf. (*Id.*). She indicated as well that she slept three to five hours "during the day," and "[m]aybe two to three" at night "even if that much." (Tr. 57). Racing thoughts kept her awake. (Tr. 60). She also "didn't care about my personal hygiene. . . . So like my mother would have to tell me to comb your hair, brush your teeth, take a shower. Things like that," on a daily basis. (Tr. 61). Her mother and son would have to coax her to eat and take her pills. (Tr. 61-62). And in 2012, though she was uncertain about in which month, Brown attempted suicide via a pill overdose. (Tr. 66). This began to turn around for her in January 2013, when "I started going to different groups, and . . . [m]y medication was changed several times, to the point where I was able to function." (Tr. 49). These groups were "positive thinking groups, anxiety groups to help me with the anxiety so I would be able to get out of the house and go out," as well as "a

9

depression group, where I was able to just be around other people who had the same problems that I did." (*Id.*).

Brown then listed the medications she was taking at the time of the hearing, which included "Remeron, 45 milligrams [at night]; Benadryl, 25 milligrams; Cogentin, 1 milligram; Remeron, 15 milligrams [in the morning]; Klonopin, 5 milligrams; and Ability, 5 milligrams." (Tr. 50). She began taking Remeron, Benadryl, Cogentin, and Abilify around October 2012, and she began taking Klonopin about two or three years prior to the hearing, though the dosage was increased in 2012. (Tr. 50-53).

Moving to the subject of hospitalizations, Brown said she had been hospitalized "about four or five times" since September 1, 2011. (Tr. 57). This occurred "[b]ecause I was depressed and . . . . I wasn't functioning." (*Id.*). She was also suicidal, and "had attempted suicide." (*Id.*). These hospitalizations included several stints at Detroit Receiving Hospital from September 7, 2012 to September 17, 2012 for suicidal ideation. (Tr. 58). A change of medication thereafter allowed her to function. (*Id.*). When she began to look for a job in January 2013, it was the first time she had motivation to do so since September 2011. (Tr. 58-59). Even so, at the time of the hearing she purportedly struggled with anxiety "on a day-to-day basis." (Tr. 59). This included "panic attacks" "[p]robably once or twice a week," as well as intermittent paranoia. (*Id.*).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of VE Michelle Marie Peters-Pagella to determine Brown's ability to perform work. (Tr. 66). In the first hypothetical, the ALJ provided for "no exertional limitations. However, the individual is limited to unskilled,

10

routine work that is non-production oriented and self-paced, with no more than occasional contact with the public, co-workers, and supervisors. There are some postural and environmental limitations. The individual should not climb ladders, ropes or scaffolds, and should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust gases, and poor ventilation. Further, the individual is restricted from workplace hazards such as dangerous moving machinery and unprotected heights. Given those limits, I presume that past work is precluded, but is there any other work for such an individual?" (Tr. 67-68). The VE indicated that possible jobs included "sorting positions"—with 1,800 available positions in Michigan and 385,000 in the national economy—"dishwashing positions"— with 2,500 available positions in Michigan and 450,000 in the national economy—and "janitorial type positions"—with 4,000 available positions in Michigan and 495,000 in the national economy. (Tr. 68).

The ALJ then posed her second hypothetical, and the VE was to "assume, in addition to the limitations that I described before, that the individual will be expected to be off task at least 20 percent of the work period, due to fatigue and emotional symptoms. Would that allow for the performance of the jobs you identified or any others?" (Tr. 71). The VE indicated that "would eliminate all work." (*Id.*). To this, Brown's attorney added the limitation that "[i]n addition to the being off task for 20 percent of the day, if an individual was missing work or was hospitalized numerous times in a year, in which it spread out. They were missing more than two days a month on a regular and consistent basis, . . ." (Tr. 71-72). The VE confirmed that such a limitation "would eliminate all substantial gainful activity. There'd be no work." (Tr. 72).

11

### F.        Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

13

must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR

14

96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)  [D]aily activities;
(ii)  The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)  Treatment, other than medication, . . . received for relief of . . . pain;
(vi)  Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the

16

Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though

17

the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v.*

18

*Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this

19

test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However, courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of changed circumstances, he or she should make this approach clear and cite the appropriate cases and acquiescence rulings. Regardless of which path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the

claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G.      Analysis

Brown rests her argument on three arguments: (1) that the ALJ erred in failing to obtain an updated consultative examination after Brown submitted "over 350 pages of medical records" not originally before the state agency medical consultant, (Doc. 13 at ID

1490-93); (2) that the ALJ erred in failing to properly assess Brown's mental RFC "as required by SSR 96-8p and SSR 85-15," (Doc. 13 at 1493-95); and (3) that the ALJ erred in not according "adequate weight to the opinion of [Brown's] treating physician." (Tr. 1495-98). I address each argument in turn.

### 1.     Failure To Obtain an Updated Consultative Examination

Brown first claims that "the ALJ failed to follow SSA policy that requires updated medical expert opinion when information is received that could affect the expert's previous findings." (Doc. 13 at ID 1491). According to Brown, the "additional medical evidence" could have "modif[ied] the State Agency Medical Consultant's findings that the impairment is not equivalent in severity to any impairment in the Listing." (*Id.*). When the consultative examiner, Dr. Rose Moten, examined Brown, she had "only two exhibits in the record[:] . . . the St. John's Hospital Records from September 10, 2011 to February 19, 2012 . . . and [the records] from Detroit Receiving Hospital from September 7, 2012." (Doc. 13 at ID 1492) (internal citations omitted). She did not, however, "have the treating medical records from Gateway Detroit East covering the period of October 2, 2012 through February 4, 2014 . . . or her other hospital records concerning her other hospitalizations." (*Id.*) (internal citation omitted). Due to this discrepancy, Brown suggests that SSR 96-6p required the ALJ "to call a medical advisor or obtain an updated medical consultative examination." (Doc. 13 at ID 1493).

In accordance with SSR 96-6p, 1996 WL 374180 (S.S.A. July 2, 1996), an ALJ "and the Appeals Council must obtain an updated medical opinion from a medical expert" when "additional medical evidence is received that in the opinion of the [ALJ] or the

Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* at *4. This proves the case when, for instance, the consultative examiner makes no finding on equivalency—see *Harris v. Comm'r of Soc. Sec.*, 2013 WL 1192301, at *8 (E.D. Mich. Mar. 22, 2013) ("[T]he great weight of authority holds that a record lacking any medical expert opinion on equivalency requires a remand.")—or when the ALJ fails to clarify, implicitly or explicitly, why fresh records remain consistent with those upon which the consultative examiner relied. *Cf. Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 724 (6th Cir. 2012) ("Although the ALJ did not explicitly hold that an updated medical opinion was unnecessary, in light of his determination that the [new] records did not save Claimant's claim, he implicitly decided that the records would not change the opinions of the experts."). But the ALJ need not request an updated examination when a plaintiff "fails to identify evidence that would support a finding that [she] meets or equals a listing," and the ALJ does not "believe[] new evidence may suggest that [a plaintiff's] condition equaled the severity of any impairment in the Listing of Impairments." *Freeman v. Comm'r of Soc. Sec.*, No. 14-CV-11146, 2015 WL 404332, at *11 (E.D. Mich. Jan. 29, 2015).

When Dr. Moten performed her consultative examination, she held before her records from "BCA of Detroit," "St. John Hospital," "DRH," *and* "Detroit East." (Tr. 131). She summarized each of these records in her evaluation, and notes that the first was dated October 2, 2012, and that "[t]here are several med reviews in file," the "most recent" dated June 18, 2013. The summary attached to these records details their contents at length. As

an initial matter, therefore, the record disagrees with Brown's claim that Dr. Moten did *not* "have the treating medical records from Gateway Detroit East . . . ." (Doc. 13 at ID 1492). In other words, Dr. Moten reviewed more evidence than Brown seems willing to acknowledge. And, as the Commissioner correctly notes, Exhibits B5F and B6F, which Dr. Moten did not consider, are either related to a period subsequent to her alleged period of disability—and therefore immaterial—or duplicative of Exhibit 3BF, which Dr. Moten *did* review—and therefore stale. (Tr. 491-95, 503-09) (falling outside the alleged period of disability). *Compare* (Tr. 496-97), *and* (Tr. 510-22), *with* (Tr. 467-68), *and* (Tr. 471-85). The only pages therein not under this umbrella of irrelevancy detail an October 2, 2012 appointment in which Brown was "[e]asily irritable and distracted," but free of "delusions or hallucinations" and presenting "[n]o evidence for any active suicidal thoughts, ideas, plans or behaviors," (Tr. 524)—as well as an October 16, 2012 appointment in which "[s]he report[ed] to have been doing . . . better but still [felt] somewhat sedate through the day." (Tr. 486). In other words, these pages disclose nothing that undermines the ALJ's opinion. And in any case, the ALJ referenced these records. (Tr. 25).

Evaluating the remainder of Brown's claim requires parsing the records not before Dr. Moten which she alleges are (1) new and material, and (2) prove the need for a new medical examination—that is, Exhibits B7F through B17F. Although the ALJ does not explicitly cite all such records, she does cite Exhibits 7F, 8F, and 12F through 17F, for the proposition that the symptoms prompting her hospitalizations were "described as being of only brief prior onset." (Tr. 22, 24 & n.2). This is accurate. A large portion of these records involves routine medical orders and laboratory tests, haphazard and largely inconsequential

notations, and drug prescriptions already known and elaborated upon in other medical records before Dr. Moten. *E.g.* (Tr. 529-34) (in Exhibit B7F); (Tr. 602-10) (in Exhibit B8F); (Tr. 995-1026) (in Exhibit B12F); (Tr. 1083-91) (in Exhibit B13F); (Tr. 1155-1158) (in Exhibit B14F); (Tr. 1201-13) (in Exhibit B15F); (Tr. 1314-37) (in Exhibit B17F). The substantive information included therein largely mirrors information included in the record before Dr. Moten. *Compare, e.g.*, (Tr. 371) (from Exhibit B1F—February 19, 2012: "Pt. presents with a hx of Major Depression, . . . and has presented with suicidal thoughts with a plan to either cut her wrists or take an overdose of her medication."), *and* (Tr. 455) (from Exhibit 2F—September 17, 2012: noting rapid improvement over course of hospitalization), *with* (Tr. 634) (from Exhibit B8F—February 19, 2012: documenting hospitalization for "suicidal ideation"), *and* (Tr. 1030) (from Exhibit 12F—September 8, 2012: noting that Brown was "[s]table" a day after being hospitalized, and relaying her initial complaints that she was "afraid to go outside to leave [the] house," as well as her mother's statement that she could not "think properly"), *and* (Tr. 1223-25) (from Exhibit B15F—February 20-21, 2012: recording some difficulty sleeping with "awake in bed" notations during Brown's hospitalization). Although these records provide extra details about the hospitalizations Dr. Moten reviewed, they certainly do not demonstrate a need to obtain a renewed consultative examination.

The remaining records not explicitly cited by the ALJ tend to nevertheless align with her findings, further signaling that she considered them and found them wanting. *Compare, e.g.*, (Tr. 379) (from Exhibit B1F—September 16, 2011: "The patient states that her mood is slightly better. The patient emphatically denied any active or passive suicidal

ideation."), *and* (Tr. 371) (from Exhibit B1F—February 19, 2012: "Her boyfriend, . . . observed the patient to be very depressed, unable to function, 'losing the will to live.'"), *with* (Tr. 704) (from B9F—September 16, 2011: listing symptoms of Brown's condition upon admission to the hospital), *and* (Tr. 863) (from Exhibit B11F—February 19, 2012: writing that Brown "had planned on [an overdose]"). Exhibit B10F, by contrast relates entirely to a November 2010 hospitalization outside the scope of the alleged period of disability—if anything, it further confirms that Brown's later hospitalizations fail to demonstrate any change in the circumstances of her conditions. *E.g.* (Tr. 758) (November 30, 2010: documenting Brown's hospitalization for depressive thoughts and suicidal ideations).

In short, a review of Brown's extensive medical record validates the ALJ's evidentiary analysis.

## 2.     Brown's Mental RFC

Brown next contends that "nowhere in the ALJ's decision does the ALJ actually discuss the medical evidence in relationship to her ability to understand, carryout and remember instructions, use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting as required by SSR 96-8p." (Doc. 13 at ID 1494-95). The ALJ's failure to discuss Brown's limitations in any meaningful sense, she alleges, warrants remand.

"SSR 96-8p requires an ALJ to individually assess the exertional (lifting, carrying, standing, walking, sitting, pushing, and pulling), and non-exertional (manipulative, postural, visual, communicative, and mental functions) capacities of the claimant in

determining a claimant's RFC." *Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002); *see* SSR 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996) ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. . . . In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Where, however, a prior RFC has become binding, a subsequent ALJ must give the prior RFC force if no new and material evidence demonstrates deterioration of a claimant's condition.

The ALJ's analysis in this case telegraphs her considerations at each step: She noted, for example, that Brown "related symptoms including self-isolation, inability to focus, suicidal ideation, memory loss, panic attacks, inability to make decisions, and racing thoughts." (Tr. 24). She then noted, however, that evidence from Brown's "three inpatient hospitalizations spanning a year . . . within her alleged period of disability" were not of extended duration and resulted in no "follow-up or maintenance therapy" in the interim. (*Id.*).[1] She reasoned that Brown's GAF score of 50 was only "marginally probative" because it documented "functioning at a specific point in time" rather than a longitudinal analysis. (Tr. 25). Indeed, she cited findings from Dr. Raju that Brown was often "doing better or fairly well, with few if any bad days." (Tr. 25); *see, e.g.*, (Tr. 478) ("No noted signs of side effects from the medications. Screening for suicidal and homicidal risk factors is rather negative. Has a good awareness of rights and wrong and consequences of

---

[1] Because I evaluate the ALJ's discussion of this evidence in the prior section, I omit its reiteration at this juncture.

behaviors and consequences of noncompliance with recommended care and treatment."). And she pointed out that records from Gateway Detroit East conveyed "observations that [Brown was] doing better or fairly well" after returning to work, and that "differ[ed] little in substance or tone" from records antedating her return to work, signifying that "her condition prior to returning to work differed little from her condition after returning to work." (Tr. 25); *see, e.g.*, (Tr. 473) (June 4, 2013 (after Brown returned to work): "Indicates that she continues to feel overtly anxious and apprehensive, especially related to life situations. . . . Feels overwhelmed. Continues with significant problems with self esteem issues and inability to make decisions."). These facts—juxtaposed with an absence of "formal opinions from any of [Brown's] own doctors or even from non-medical sources," a "dearth of evidence that [Brown] followed through with outpatient mental health therapy for much of the relevant time period," and "discrepancies in [Brown's] function reports and her failure to be forthcoming at the hearing concerning the subject of her boyfriend"— suggested that Brown's functional capacity had not changed. (Tr. 25-26).

Brown's claim that the ALJ failed to discuss the medical evidence proves hard to stomach in light of the ALJ's (perfectly evident) exercise in weighing the available evidence, resolving discrepancies therein, and citing the medical record over the span of five pages to support her ultimate conclusion that no new or material evidence showed changed circumstances or the need for a different RFC. (Tr. 23-27); *accord Isaac v. Comm'r of Soc. Sec.*, 2013 WL 4042617, at *11 (E.D. Mich. Aug. 9, 2013) ("Isaac's argument that the RFC is unsubstantiated, unexplained, and not in compliance with SSR 96-8p's narrative discussion requirement is not well taken. The ALJ devoted four pages to

careful review and assessment of the evidence, formulated a detailed summary of Isaac's limitations, and cited specific evidence in support of his conclusions. This was sufficient." (internal citations omitted)). Without the authority to revise the RFC, there proved no need to revisit an itemized justification for the limitations it incorporated in the particular manner Brown now requests. *See Blankenship v. Comm'r of Soc. Sec.*, 624 F. App'x 419, 425 (6th Cir. 2015) ("Read together, *Drummond* and Acquiescence Ruling 98-4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings of a prior ALJ unless the claimant presents new and material evidence that there has been either a change in the law or a change in the claimant's condition.").

In light of the ALJ's thorough evaluation, her conclusion that the prior RFC should remain in force is supported by substantial evidence.

### 3.      The Weight Accorded Brown's "Treating Physician"

Brown's last assertion is that the ALJ did not provide good reasons for discrediting her treating physicians. (Doc. 13 at ID 1495-96). The medical evidence, she suggests, show significant worsening of her condition since the prior ALJ's decision, including signs that "she ha[d] made little progress and [was] still having difficulties with day-to-day activities," that she was "noted to have increased fears and anxiety and [was] obsessing about what to do," that she had "developed agoraphobic fears that were immobilizing her activity" causing her to "beg[i]n to decompensate with very low motivation to get dressed or leave her house," and that she "returned to outpatient therapy . . . with continued thoughts of suicide," among other things. (Doc. 13 at ID 1496-97). Brown notes, as well, that records show that "the severity of her mental health required a higher level of care [as] . . . . she

30

ha[d] been hospitalized on five occasions with brief periods in day treatment despite undergoing consistent treatment at Eastwood Clinics." (Doc. 13 at ID 1497). "Clearly, the treating medical records were not properly reviewed by the ALJ and this matter should be remanded pursuant to 20 C.F.R. § 404.1527 to accord adequate weight to the opinion of [Brown's] treating physicians at Eastwood Clinics." (Doc. 13 at ID 1498).

Where the record contains statements from a claimant's treating source, such statements are typically entitled to more weight because such sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). When discounting opinions from treating sources, "[t]he ALJ must provide sufficiently specific reasons . . . 'to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Linebarger v. Astrue*, No. 11-12949, 2012 WL 3966277, at *2 (E.D. Mich. Sept. 11, 2012) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)).

As an initial matter, the ALJ addressed this very issue in her opinion—"the claimant [had] not offered (and the record [did] not contain) any formal opinions from any of [Brown's] own doctors or even from non-medical sources analyzing her residual functional capacity. Overall, the record [did] not contain any opinions from treating or examining physicians indicating that the claimant [was] disabled or even that she [had] limitations greater than those determined in this decision." (Tr. 26). Even in her brief, Brown refers

31

only to records from "Eastwood Clinics" without identifying any particular physician, an impermissible analytical shortcut. The Court is not obligated to comb through the various physician cameos in her medical records to invent an argument on her behalf. As such, the Court should find this argument waived. *Accord Taylor v. Comm'r of Soc. Sec.*, 2014 WL 823398, at *11 n.1 (E.D. Mich. Feb. 10, 2014) ("Although plaintiff's motion contains a discussion of the 'treating physician rule,' she does not identify any treating physician or treating physician's opinion that the ALJ purportedly failed to properly address. Thus, this argument should be deemed waived." (internal citations omitted)).

For the sake of argument: Even had Brown adequately posited this argument, the ALJ's reasoning as to the Eastwood Clinic records fulfilled her duties. As the Commissioner notes, the only records from a particular "Eastwood Clinic"—not cited by Brown—are identical copies of an August 29, 2011 letter documenting her medications. (Tr. 608, 639, 725-29, 947). This does not qualify as a medical opinion, and the ALJ cannot have erred in declining to expressly weigh it. *Cf. Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 246 n.1 (6th Cir. 2015) ("In June 2009, Dr. Maltese wrote 'off work indefinitely' on a prescription pad. As the district court aptly observed, we have previously held that this kind of one-sentence note does not qualify as a 'medical opinion' under the Social Security regulations because it does not reflect a judgment about the nature and severity of the claimant's impairments." (internal citation omitted)). To the extent Brown may be referring (albeit inarticulately) to doctors and nurses involved in her hospitalizations discussed above, the ALJ's discussion of such records easily surpasses her analytical obligations.

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Brown's Motion for Summary Judgment, (Doc. 13), be **DENIED**, that the Commissioner's Motion, (Doc. 14), be **GRANTED**, and that this case be **AFFIRMED**.

## III.     <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 28, 2016                        S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge


## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 28, 2016                         By s/Kristen Castaneda
                                                Case Manager